J-S61028-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| GREGORY STEVENS | |
| Appellant | No. 1684 MDA 2014 |

Appeal from the Judgment of Sentence of August 21, 2014
In the Court of Common Pleas of Luzerne County
Criminal Division at No.: CP-40-CR-0003409-2013

BEFORE: PANELLA, J., WECHT, J., and STRASSBURGER, J.[*]

MEMORANDUM BY WECHT, J.:                    **FILED DECEMBER 11, 2015**

Gregory Stevens appeals his August 21, 2014 judgment of sentence. We affirm the judgment of sentence in part, and we vacate it in part.

Based upon events that occurred on December 21, 2013, which we detail immediately below, Stevens was charged with robbery, theft by unlawful taking, simple assault, and three counts of criminal conspiracy.[1] Prior to trial, Stevens filed a motion to suppress evidence relating to his out-of-court identification and evidence of conversations that were intercepted while he was incarcerated on these charges. Following a hearing, the trial court denied the motion. Stevens waived his right to a jury trial, and the

_____

[*]    Retired Senior Judge assigned to the Superior Court.

[1]    18 Pa.C.S. §§ 3701, 3921, 2701, and 903, respectively.

parties agreed to incorporate the testimony from the suppression hearing into the trial record. The Commonwealth produced additional testimony from the victim of the robbery. At the conclusion of trial, the trial court found Stevens guilty of all of the charges.

The following is a summary of the evidence that was produced at the suppression hearing and the bench trial.

On December 21, 2013, Burgit's Taxi service in Wilkes-Barre, Pennsylvania, dispatched Henry Robinson to 28 North Grant Street to service a customer that had called and requested a ride. When Robinson arrived at that location, five individuals got into Robinson's cab. Robinson drove the individuals to their desired location. However, when they arrived there, only three of the individuals exited the cab. Two males remained in the cab, and requested to be taken to a nearby Turkey Hill convenience store. Robinson agreed to continue on to that location.

When they arrived at the Turkey Hill, one of the men exited the cab and went into the store. The man, wearing a hoodie and marked with tattoos on his face, tried to purchase cigarettes from the store, but to no avail because he did not have identification proving that he was old enough to buy cigarettes. The man returned to the cab and asked Robinson to take them back to the original drop-off location.

When they arrived back at the first location, one of the men, later identified as Stevens, got out of the cab, opened the front passenger door, and struck Robinson in the face with a gun. The two men hit Robinson two

or three more times in the head. While doing so, they stole Robinson's watch, cell phone, ring, and wallet. The men then removed Robinson from the cab and forced him to lie on the ground while they rummaged through the cab for additional items to steal. They then told Robinson to stand up and run away. Robinson fled to a nearby Rite Aid pharmacy, where he called for police assistance.

Sergeant Phil Holbrook and Corporal Dennis Monk, after learning the details of the robbery, went to the Turkey Hill store and watched the surveillance video. Shortly thereafter, they received information that another call had been placed to Burgit's Taxi seeking a ride from 66 Kirby Avenue, which was located across the street from the original drop-off location. Sgt. Holbrook and Cpl. Monk believed that the call may have been made by the individuals that had perpetrated the robbery.

Cpl. Monk knew the family that resided at that residence. He attempted to contact the house, but no one answered. He then called the owner of the house, Carol Kephart. Kephart told Cpl. Monk that only her two children were permitted in the home, because she was out of town. She consented to police entering the residence and to a subsequent search once inside.

The police located eight people inside of the home. The police handcuffed the eight people for the officers' safety. The police decided to bring Robinson to the house and have him attempt to identify either of the robbers. Robinson sat in a police car that was parked approximately fifty

yards from the front door of the residence. Sgt. Holbrook instructed another officer to bring each individual to the front door, one at a time. Sgt. Holbrook removed the handcuffs from each individual as they came to the door and told each person that they were free to leave. When Stevens came to the door, uncuffed and informed that he too was free to leave, Robinson immediately recognized him as one of the men who had robbed him. Robinson did not see Stevens at any time with handcuffs on his wrists. Stevens was then stopped, and arrested. Robinson stated that he was absolutely certain that Stevens was one of the robbers. The police searched the residence and found many of the items that were taken from Robinson and the taxi. The police also found a firearm.

Once at the police station, the police provided Stevens with ***Miranda***[2] warnings. Stevens denied participating in the robbery. He asserted that, on the night in question, he had consumed some drugs and had fallen asleep. He later admitted to the police that they had done a good job investigating the crime, but that they would have done even better if they had caught the other guy as well. When Stevens was processed at the jail for intake purposes, the police found $160.00 in twenty-dollar bills in Stevens' sock.

While in jail awaiting trial, Stevens made several phone calls that were recorded, and ultimately intercepted and reviewed by the police. The jail

---

[2] ***Miranda v. Arizona***, 384 U.S. 436 (1966).

posted signs that informed the inmates that their phone calls may be intercepted, monitored, or divulged to law enforcement authorities. Stevens was provided with an identification number for use during phone calls and a release form, which he signed, indicating the same. Captain Mark Rockovich, who was the head of intelligence and security at the jail, emailed the assistant district attorney with the following information:

> We do not have any written guidelines regarding monitoring phone calls or visits. I am the only one in the prison that has access to listen to phone calls directly. To assist in investigations regarding matters of security for the prison, the Warden or Deputy Warden will direct me to provide prison staff with recordings for review. The procedure to obtain recordings for law enforcement are made pursuant to Title 18 Section 5704, (14)(1)(C), which permits disclosure of such intercepted recorded material in response to a Court Order or in the prosecution or investigation of any crime.
>
> Simply put, the prison will listen when we believe there may be a threat to security of our facility and we will give copies to law enforcement with a court order or if they are investigating a crime.
>
> In the case of Gregory Stevens, a court order was signed by the Honorable Judge Gartley on October 28th, 2013, directing me to "turn over all of the telephone recordings, including visitor communications from inmate Gregory Stevens, Jr. from the date of incarceration, September 22nd, 2013 to October 29th of 2013. The second recording provided to the Fairview Township Police was from October 29th of 2013 to January 8th of 2014.[3]

---

[3] All of the evidence pertaining to the intercepted recordings, including the signs and email, were introduced into the record via stipulation by the parties.

In the recordings, Stevens discusses the charges against him, as well as the gun that was used during the robbery and assault. Furthermore, Stevens admits on the recordings that he should not have pistol-whipped Robinson.

As noted, the trial court convicted Stevens of all charges. In doing so, the trial court also specifically concluded beyond a reasonable doubt that Stevens used a firearm during the commission of the robbery. On August 21, 2014, Stevens appeared for sentencing. Stevens argued that the trial court was precluded from applying the deadly weapon enhancement in the sentencing guidelines, *inter alia*, because of the United States Supreme Court's decision in **Alleyne v. United States**, 133 S.Ct 2151 (2013). The trial court rejected Stevens' arguments, and applied the deadly weapon enhancement in sentencing Stevens. The court sentenced him to an aggregate sentence of sixty months to one hundred and twenty months in prison, to be followed by twenty-four months of probation.

On September 2, 2014, Stevens filed a motion to modify his sentence, which the trial court denied by an order dated September 5, 2014, and filed on September 9, 2014. On October 1, 2014, Stevens filed a notice of appeal.[4] In response, the trial court directed Stevens to file a concise

---

[4] On October 24, 2014, this Court issued a rule to show cause on Stevens as to why this appeal should not be quashed as untimely. Stevens had appealed orders that had not been entered into the docket, and, thus, the appeal appeared to be untimely. Following subsequent orders from this Court, the trial court entered the orders on the docket, which demonstrate
*(Footnote Continued Next Page)*

statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Following an extension of time, Stevens filed a concise statement. On December 22, 2014, the trial court issued an opinion pursuant to Pa.R.A.P. 1925(a).

Stevens raises the following six issues for our consideration:

1. Whether the trial court erred by denying [Stevens'] motion to suppress where [Stevens] was illegally seized by officers who lacked probable cause for an arrest and, in the alternative, reasonable suspicion for an investigatory detention and all evidence resulting from said illegal seizure, including the identification, were fruit of the poisonous tree? [Stevens] was illegally seized in violation of the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.

2. Whether the trial court erred by denying [Stevens'] motion to suppress where [Stevens] was under arrest and denied his right to an attorney at the in-person line up, in violation of the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution, and all evidence resulting from said illegal line up, including the identification, were fruit of the poisonous tree?

3. Whether the trial court erred by refusing to suppress intercepted recordings of [Stevens] where the superintendent, warden, or a designee of the superintendent or warden or other chief administrative official of the Luzerne County Correctional Facility failed to promulgate guidelines to implement the provisions of 18 Pa.C.S. § 5704(14)?

4. Whether [Stevens'] sentence is illegal because the Pennsylvania deadly weapon enhancement to the sentencing guidelines (204 Pa.Code § 303.10(a)(2)) is unconstitutional under ***Alleyne v. United States*** as violative of [Stevens']

*(Footnote Continued)* ——————————

that Stevens' appeal was timely. There is no jurisdictional impediment to our review of this case.

right to a jury trial pursuant to the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution?

5. Whether the trial court erred by applying the Pennsylvania deadly weapon enhancement to the sentencing guidelines (204 Pa.Code § 303.10(a)(2)) where the Commonwealth amended the information to make possession of a weapon an element of the offense and the deadly weapon enhancement shall not be applied where such element is part of the statutory definition of the crime?

6. Whether the Commonwealth failed to present evidence sufficient to demonstrate beyond a reasonable doubt that [Stevens] committed separate conspiracies to commit robbery, theft by unlawful taking, and simple assault, rather than one conspiracy, where the totality of the circumstances indicate that only a single conspiracy occurred?

Brief for Stevens at 2-4 (numbering added for ease of discussion and disposition).

Stevens' first three issues arise from the trial court's denial of his pre-trial suppression motion. Our standard of review for such claims is as follows:

In addressing a challenge to a trial court's denial of a suppression motion, we are limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Since the Commonwealth prevailed in the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Brown*, 64 A.3d 1101, 1104 (Pa. Super. 2013) (citation omitted). Our scope of review in suppression matters includes only the

suppression hearing record, and excludes any evidence elicited at trial. *See In re L.J.*, 79 A.3d 1073, 1085 (Pa. 2013).

In his first issue, Stevens alleged that he was seized in violation of the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution when the police entered the residence on Kirby Avenue and detained everyone inside. Stevens contends that the interaction between him and the police constituted an arrest, but it was not supported by probable cause. In the alternative, Stevens maintains that, if the encounter was an investigatory detention, reasonable suspicion also was lacking.

Our resolution of this claim necessarily depends upon the nature of the encounter between Stevens and the police. Interactions between police and citizens are broken down into three categories: mere encounters, investigative detentions, and custodial detentions. *Commonwealth v. DeHart*, 725 A.2d 633, 636 (Pa. Super. 2000). Each level requires a distinct level of justification, depending upon the nature of the interaction between the police and the citizen. *Id.* A mere encounter can be any formal or informal interaction, and carries no official compulsion to stop and respond. Thus, it does not require any level of suspicion. *Commonwealth v. Guzman*, 44 A.3d 688, 692 (Pa. Super. 2012). An investigative detention carries with it an official compulsion to stop and respond, and, while temporary, must be justified by "specific and articulable facts creating a reasonable suspicion that the suspect is engaged in criminal activity."

*Commonwealth v. Jones*, 874 A.2d 108, 116 (Pa. Super. 2005) (quoting

*Dehart*, 725 A.2d at 636).   An arrest, otherwise known as a custodial

detention, must be supported by probable cause.   *Id.*

> An encounter becomes an arrest when, under the totality of the circumstances, a police detention becomes so coercive that it functions as an arrest.  The numerous factors used to determine whether a detention has become an arrest are the cause for the detention, the detention's length, the detention's location, whether the suspect was transported against his or her will, whether physical restraints were used, whether the police used or threatened force, and the character of the investigative methods used to confirm or dispel suspicions.

*Commonwealth v. Stevenson*, 894 A.2d 759, 770 (Pa. Super. 2006)

(citations omitted).

> On the other hand:

> "An investigative detention occurs when a police officer temporarily detains an individual by means of physical force or a show of authority for investigative purposes." *Commonwealth v. Smith*, 904 A.2d 30, 35 (Pa. Super. 2006) (quoting *Commonwealth v. Barber*, 889 A.2d 587, 592 (Pa. Super. 2005)).  In other words, in view of all the circumstances, if a reasonable person would have believed that he was not free to leave, then the interaction constitutes an investigatory detention.  *See Commonwealth v. Peters*, 642 A.2d 1126, 1129 (Pa. Super. 1994) (quoting *Commonwealth v. Harper*, 611 A.2d 1211, 1215 (Pa. Super. 1992)); *Commonwealth v. Hill*, 874 A.2d 1214, 1218-19 (Pa. Super. 2005) (quoting *Commonwealth v. Johonoson*, 844 A.2d 556, 562 (Pa. Super. 2004)).  An investigatory detention triggers the constitutional protection of the Fourth Amendment to the United States Constitution, Article I, Section 8 of the Pennsylvania Constitution, and the prerequisites for such a detention as set forth in *Terry v. Ohio*, 392 U.S. 1, 23–26, (1968); *Smith*, 904 A.2d at 35 (quoting *Barber*, 889 A.2d. at 592).

An investigative detention is lawful if supported by reasonable suspicion. ***Commonwealth v. Sands***, 887 A.2d 261, 269 (Pa. Super. 2005) (quoting ***Hill***, 874 A.2d at 1217). "To meet the standard of reasonable suspicion, the officer must point to specific and articulable facts which, together with the rational inferences therefrom, reasonably warrant the intrusion." ***Smith***, 904 A.2d at 35 (quotation omitted). In addition, "we must look to the totality of the circumstances to determine whether the officer had reasonable suspicion that criminal activity was afoot." ***Id.*** at 35–36 (quoting ***Barber***, 889 A.2d at 593). An investigative detention may last "as is necessary to confirm or dispel such suspicion." ***Commonwealth v. LaMonte***, 859 A.2d 495, 500 (Pa. Super. 2004) (quoting ***Commonwealth v. Strickler***, 757 A.2d 884, 889 (Pa. 2000)).

***Commonwealth v. Cauley***, 10 A.3d 321, 325-26 (Pa. Super. 2010) (citations modified; footnote omitted).

Under the circumstances of this case, no reasonable person would have felt free to leave. However, that factor does not distinguish an investigatory detention from an arrest. Both types of encounters curtail an individual's freedom of movement. We must consider the other factors listed above. To do so, we first must review the facts elicited at the suppression hearing.

On December 21, 2013, Stevens and four of his acquaintances called and requested a taxi. The taxi, driven by Robinson, picked them up and dropped three of them off in a lot adjacent to 66 Kirby Avenue. Stevens and another man remained in the cab, and requested a ride to a convenience store. They then requested that Robinson drive them back to the location across from 66 Kirby Avenue. There, they beat Robinson with a gun and took his belongings.

- 11 -

The police investigated the robbery. At approximately 6:00 a.m. the next morning, a mere seven hours after the robbery, someone called the same taxi company from 66 Kirby Avenue and requested transportation. The police suspected, due to the proximity in time and location from the robbery, that the same individuals that had requested the cab earlier that night had placed the call.

The police surrounded the residence and attempted to contact people inside the home. Initially unsuccessful, the police contacted the owner of the residence, who indicated that only her two children were permitted to be in the residence when she was away. She also consented to the police entering the home. Because they believed that the perpetrators of the robbery may be inside, and because they knew that a firearm had been used in the robbery, the police officers entered the residence with their weapons drawn and announced their presence. The police found eight individuals inside of the home. The police informed them that they were there to investigate the robbery. The individuals then became angry and hostile, yelling at the officers. Some of the individuals ignored orders to remain where they were, and spread out throughout the residence.

After the individuals continued to ignore orders to remain in the living room, the police handcuffed each of them, searched them for weapons, and ordered them to remain in the living room until they received further instruction from the officers. Cpl. Monk then spoke with each individual,

requesting their names and dates of birth. Stevens was one of the individuals that was detained in the living room.

Having considered these facts, and the applicable legal factors and standards, we conclude that Stevens' detention at 66 Kirby Avenue was an investigative detention. Undeniably, Stevens was detained against his will and handcuffed. But, those are only two factors, and neither is dispositive. Stevens, and the others, were detained to investigate whether any of the individuals were involved in the robbery. The cause of the detention was not to permanently detain anyone, or to effectuate a formal arrest, but rather to investigate. Stevens was not detained for an unreasonable amount of time, nor was he transported in any meaningful way to another location. The detention occurred inside a residence, one in which he was not permitted to be, not in a police car or at the police station. No force or threat of force was utilized against Stevens. Of course, the police had their service weapons drawn during entry, but that clearly was for their safety given the nature of the crime that they were investigating and the fact that a gun was used in that crime. Finally, nothing about the character or the investigative methods used by the police compellingly demonstrates that the encounter rose to the level of an arrest.

To the contrary, the character of the investigation demonstrated that the detention was not permanent, but rather was temporary and for the purpose of determining the identity of the individuals inside the home and whether they had participated in the robbery. For this reason in particular,

and in conjunction with the reasons above, Stevens' encounter with the police was an investigatory detention.

Having so determined, we next must decide whether the investigative detention was supported by reasonable suspicion. As noted, within a span of seven hours, Stevens and his friends requested a taxi to a lot across the street from 66 Kirby Avenue, the taxi driver had been beaten with a gun and robbed, and then the same taxi service received a call from 66 Kirby Avenue. The police reasonably concluded that these events were connected, and possessed the requisite reasonable suspicion to justify the detention. Hence, the trial court correctly concluded that Stevens was not unconstitutionally detained.

In his second issue, Stevens maintains that Robinson's on-scene identification of him exiting 66 Kirby Avenue was unconstitutional, because, according to Stevens, he was entitled to have counsel at the time of his arrest and subsequent identification. Stevens primarily relies upon ***Commonwealth v. Minnis***, 458 A.2d 231 (Pa. Super. 1983), and ***Commonwealth v. Richman***, 320 A.2d 351 (Pa. 1974), both of which stand for the proposition that the right to counsel attaches to identification confrontations and procedures following warrantless arrests. However, neither of these cases applies in the instant case, and his argument is unavailing.

In ***Minnis***, this Court held that "[i]n Pennsylvania, the right to counsel attaches at the time of arrest and exists for identification confrontations

occurring after arrest, except prompt on-the-scene confrontations." *Minnis*, 158 A.2d at 234. Similarly, in *Richman*, the Pennsylvania Supreme Court noted that "[t]o allow uncounseled lineups between warrantless arrests and preliminary arraignment would only encourage abuse of the exigent circumstances exception and under-cut our strong policy requiring warrants whenever feasible." *Richman*, 320 A.2d at 354. Both holdings make clear that an actual arrest is a prerequisite to triggering the right to counsel for line-up purposes. However, at the time of the identification in this case, Stevens had not yet been arrested.

In the previous discussion, we determined that the events that occurred inside of the residence did not amount to an arrest. Shortly after those events, the police transported Robinson to the scene and placed him in a police cruiser that was parked at the end of the driveway, approximately fifty yards from the front door. The occupants of the home, including Stevens, then were taken to the front door. Their handcuffs were removed. Thus, Robinson never saw them restrained in any way. They were then told that they were free to leave. Each walked out of the door and began walking away from the premises. However, when Stevens exited the house, Robinson immediately identified him as one of the perpetrators of the robbery. It was only then that Stevens was placed under arrest.

Because Stevens had not yet been arrested at the time of the identification, the right to counsel was not implicated, and he is not entitled to the benefit of either of the two cases that he principally relies upon,

*Minnis* and *Richman*. The trial court did not err by denying Stevens'

suppression motion on this claim.

In his third argument, Stevens claims that the trial court erred by not

suppressing the statements that he made during conversations that occurred

on the telephone when he was incarcerated prior to trial. Specifically,

Stevens maintains that the statements should have been suppressed

because no relevant person promulgated guidelines to comply with the

relevant portion of Pennsylvania's Wiretap Act, 18 Pa.C.S.A. §§ 5701–82.

For the reasons set forth immediately below, Stevens is not entitled to relief.

Section 5704(14) of the Wiretap Act provides, in pertinent part, that:

> It shall not be unlawful and no prior court approval shall be required under this chapter for: ...
>
> > (14) An investigative officer, a law enforcement officer or employees of a county correctional facility to intercept, record, monitor or divulge any telephone calls from or to an inmate in a facility under the following conditions:
> >
> > > (i) The county correctional facility shall adhere to the following procedures and restrictions when intercepting, recording, monitoring or divulging any telephone calls from or to an inmate in a county correctional facility as provided for by this paragraph:
> > >
> > > > (A) Before the implementation of this paragraph, all inmates of the facility shall be notified in writing that, as of the effective date of this paragraph, their telephone conversations may be intercepted, recorded, monitored or divulged.
> > > >
> > > > (B) Unless otherwise provided for in this paragraph, after intercepting or recording a telephone conversation, only the superintendent, warden or a designee of the superintendent or warden or other chief administrative official or his or her designee, or

> law enforcement officers shall have access to that recording.
>
> (C) The contents of an intercepted and recorded telephone conversation shall be divulged only as is necessary to safeguard the orderly operation of the facility, in response to a court order or in the prosecution or investigation of any crime.

18 Pa.C.S.A. § 5704(14)(1)(A-C). The Act further mandates that "[t]he superintendent, warden or a designee of the superintendent or warden or other chief administrative official of the county correctional system shall promulgate guidelines to implement the provisions of this paragraph for county correctional facilities." *Id.* § 5704(14)(iv).

From what we can glean from his argument, Stevens believes that "promulgate" as used in subsection 5704(14)(iv) means written. In other words, Stevens contends that, because none of the enumerated parties created a written protocol for intercepting jail phone calls, any statements obtained via those calls must be suppressed. We need not answer that question specifically, because even if we assume, *arguendo*, that no relevant person in this case "promulgated" guidelines, Stevens still has not demonstrated that suppression is an available, or a justifiable, remedy.

Notably, Stevens does not claim that the purported error in this case was constitutional in nature. Thus, we turn to the section of the Wiretap Act, specifically 18 Pa.C.S. § 5721.1, which governs the available remedies for nonconstitutional violations of the Wiretap Act:

> **(b) Motion to exclude.--**Any aggrieved person who is a party to any proceeding in any court, board or agency of this

Commonwealth may move to exclude the contents of any wire, electronic or oral communication, or evidence derived therefrom, on any of the following grounds:

(1) Unless intercepted pursuant to an exception set forth in section 5704 (relating to exceptions to prohibition of interception and disclosure of communications), the interception was made without prior procurement of an order of authorization under section 5712 (relating to issuance of order and effect) or an order of approval under section 5713(a) (relating to emergency situations) or 5713.1(b) (relating to emergency hostage and barricade situations).

(2) The order of authorization issued under section 5712 or the order of approval issued under section 5713(a) or 5713.1(b) was not supported by probable cause with respect to the matters set forth in section 5710(a)(1) and (2) (relating to grounds for entry of order).

(3) The order of authorization issued under section 5712 is materially insufficient on its face.

(4) The interception materially deviated from the requirements of the order of authorization.

(5) With respect to interceptions pursuant to section 5704(2), the consent to the interception was coerced by the Commonwealth.

(6) Where required pursuant to section 5704(2)(iv), the interception was made without prior procurement of a court order or without probable cause.

18 Pa.C.S. § 5721.1(b)(1-6). Pursuant to subsection 5721.1(e), "[t]he remedies and sanctions described in this subchapter with respect to the interception of wire, electronic or oral communications are the only judicial remedies and sanctions for nonconstitutional violations of this subchapter involving such communications." 18 Pa.C.S. § 5721.1(e).

- 18 -

Subsection 5721.1(b) delineates the six nonconstitutional grounds for which suppression is an available remedy. If a defect in a wiretap interception is not a constitutional error or is not one of those six grounds, a trial court may not suppress evidence that resulted from the interception.

As noted, Stevens does not raise a constitutional argument. Thus, he must demonstrate that the error for which he complains falls within one of the six enumerated categories. However, Stevens presents no argument whatsoever that any of the six grounds applies. In fact, Stevens does not cite subsection 5721.1 at all. Consequently, even if his principal argument were meritorious, he has not demonstrated that suppression would be the correct remedy, and, therefore, has not proven that he is entitled to that form of relief.

In his fourth issue, Stevens contends that his sentence, which the trial court formulated using the deadly weapon enhancement rubric in the sentencing guidelines, is illegal. Stevens maintains that the application of the enhancement was unconstitutional pursuant to the United States Supreme Court's decision in *Alleyne*, wherein the Court held that any fact that increases the mandatory minimum sentence for crime is an "element" of the crime, not a "sentencing factor," that must be submitted to a jury to determine the validity thereof. *Alleyne*, 133 S.Ct. at 2162. Stevens recognizes that, in *Commonwealth v. Ali*, 112 A.3d 1210 (Pa. Super. 2015), this Court already has held that *Alleyne* has no application to the school zone or youth sentencing enhancements. We so held because:

[t]he enhancements do not bind a trial court to any particular sentencing floor, nor do they compel a trial court in any given case to impose a sentence higher than the court believes is warranted. They require only that a court consider a higher range of possible minimum sentences. Even then, the trial court need not sentence within that range; the court only must consider it. Thus, even though the triggering facts must be found by the judge and not the jury—which is one of the elements of an *Apprendi* [*v. New Jersey*, 120 S.Ct. 2348 (2000)] or *Alleyne* analysis—the enhancements [] are not unconstitutional under *Alleyne*.

*Ali*, 112 A.3d at 1226. Stevens urges us to reconsider the *Ali* analysis as it applies to the deadly weapon enhancement.

We do not have the authority, nor the inclination, to overrule *Ali*. Moreover, the deadly weapon enhancement, like the school and youth enhancements, imposes no mandatory minimum sentence. Like those other enhancements, it only directs the trial court to consider a different range of potential minimum sentences by adding months of incarceration to the low and high ends of the guideline range. The trial court retains the discretion to fashion an individual sentence, and is not required to sentence an individual within that specified range. Consequently, *Alleyne* has no application to this case, and Stevens' claim necessarily fails.

Stevens also argues that the trial court erroneously applied the deadly weapons enhancement because "the Commonwealth made 'with a deadly weapon' one of the statutory elements of robbery with which [] Stevens was charged." Brief for Stevens at 31-32. Indeed, and confusingly, the Commonwealth added that language to the definition of robbery in the criminal information. Stevens also correctly notes that, pursuant to the

sentencing guidelines, "[t]here shall be no Deadly Weapon Enhancement for . . . any other offense for which possession of a deadly weapon is an element of the statutory definition." 204 Pa.Code § 303.10(a)(3)(ix).

However, this proscription refers only to the elements of the "statutory definition." The definition of robbery in the Crimes Code does not include the element of the use of a deadly weapon. *See* 18 Pa.C.S. § 3701. The Commonwealth cannot change or alter that definition simply by adding language to a particular criminal information. The proscription does not refer to the language used by the Commonwealth in a criminal information, nor does it make such an alteration available. Stevens does not cite any case law that stands for the proposition that, for purposes of the application of the enhancement, the "statutory definition" of a crime is based upon the manner in which Commonwealth frames a charge in a criminal information, and we are aware of none. Stevens has not demonstrated that he is entitled to relief on this claim.

In his final claim, Stevens challenges the sufficiency of the evidence presented by the Commonwealth to establish that he entered into three separate conspiracies, one each for robbery, theft, and simple assault. Our standard of review is well-settled:

> The standard we apply . . . is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need

not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa. Super. 2011) (quoting

*Commonwealth v. Jones*, 874 A.2d 108, 120-21 (Pa. Super. 2005)).

Stevens concedes that the evidence was sufficient to prove beyond a reasonable doubt that he was guilty of conspiracy to commit robbery. *See* Brief for Stevens at 34 ("In the instant matter, it is clear that the evidence was sufficient to demonstrate only that a single conspiracy existed between [] Stevens and the other suspect to carry out actions aimed at removing property from the cab driver by force."). However, he maintains that only the robbery conspiracy existed, and that the evidence did not prove otherwise. The Commonwealth agrees. In its brief, the Commonwealth "concedes that there was insufficient evidence to establish separate conspiracies for theft and simple assault." Brief for the Commonwealth at 16.

Because of the Commonwealth's concession, we vacate Stevens' judgment of sentence as to conspiracy to commit theft and conspiracy to commit simple assault. We agree with the Commonwealth and Stevens that

the evidence was insufficient to prove separate, individual conspiracies to commit each of those crimes. Nonetheless, we need not remand for resentencing. Stevens only was sentenced on the conspiracy to commit robbery conviction. The trial court concluded that the conspiracies to commit theft and simple assault merged with the conspiracy to commit robbery. Hence, there is no reason to remand for resentencing, because our decision to vacate those two crimes does not upset the trial court's sentencing scheme in any way.

Judgment of sentence affirmed in part, vacated in part. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/11/2015